338 P.2d 790

**STATE of Arizona, Appellee,**

v.

**Claude Richard FINLEY, Appellant.**

No. 1128.

Supreme Court of Arizona.

April 29, 1959.

Martin S. Rogers, Tucson, for appellant.

Robert Morrison, Atty. Gen., and James H. Green, Jr., Asst. Atty. Gen.; Raul H. Castro, County Atty., Pima County and Marvin S. Cohen, Deputy County Atty., Tucson, for appellee.

UDALL, Justice.

The defendant-appellant, Claude Richard Finley, age 21 years, was convicted by a jury, composed of ten men and two women, of forcibly raping a 44-year-old widow, the mother of two grown children. We shall herein refer to Mrs. K—— as the prosecutrix or victim. The court sentenced defendant to serve not less than eight nor more than 16 years in the penitentiary. He appeals from the judgment of conviction and the order denying his motion for a new trial.

While there is some sharp conflict in the evidence, the material testimony—stated in a light most favorable to sustaining the judgment—is in substance this: The prosecutrix, at about 10:30 p. m. on November 1, 1957, was driving west on Speedway in Tucson when, at an intersection stop, the defendant and his friend "Jim" Thomas (both of whom were perfect strangers to her) pulled up even with her car and asked if she would go for a drink. As she kept on driving they would see-saw in and catch up with her, during which time further exchanges occurred. By hindsight these incidents were probably subject to misinterpretation by these "prowling" young men. In any event they followed her when she turned into the alleyway back of her home and there again asked her to go out with them for a drink, which she flatly refused to do. After talking to them for a few minutes she got out of her car and started into her home when they took hold of her arms and pulled her into their car. While she resisted their forcing her into the car, she made no outcry and apparently at that time was not aware of her peril for she considered "they were young guys just clowning around." Defendant drove off with her in the front seat between them. Their first stop was at the Buckaroo tavern on the Benson highway where "Jim", at a wink of the eye from defendant, left the car ostensibly to buy a bottle of liquor and that was the last seen of him that night. The defendant immediately drove off with the prosecutrix down a side road some distance and stopped. He then bluntly stated that he was going to have intercourse with her whether or not. She refused to assent to such an act.

The prosecutrix' version is that she was required to disrobe and submit to his advances by brute force and that she resisted at all times to the utmost of her ability.

We shall not recite all the lurid details, but suffice it to say that according to her testimony he forced her into the back seat of the car where he accomplished three separate acts of sexual intercourse; and during the course of these outrages he also performed unnatural sex acts involving what amounts to sodomy and fellatio as well as trying to force his fist into her vagina. It was further shown that he slapped her repeatedly and pulled her hair. She managed to scratch his face, leaving imprints that are clearly visible from photographs in evidence. The defendant took the witness stand and admitted having twice had sexual intercourse with prosecutrix, at this time and place, but asserted it was accomplished with her full acquiescence and consent. He told two different stories relative to what caused the scratches on his face.

In taking the prosecutrix home the defendant stopped at an all night service station to get water for a leaky radiator. Being fearful of her life she was unable to devise a safe means of alerting the attendant as to her plight and have him call the police. Upon arriving back at the place in the alley where he had picked her up, she was let out of the car.

Another car was parked just ahead of them and in it were four young people— the neighbor Drake sisters and their male escorts—the prosecutrix had a slight acquaintance with one of the girls. The following questions and answers give the sequence of what occurred:

"Q. And what happened then? A. I knocked on the window and by that time I was just sort of letting down and I was just shaking all over. I asked them if they would help me. I was hoping that they would realize that I needed help, that I wasn't trying to run them off or something, because I guess I kind of surprised them just coming up in the dark like that, and knocking on their window and in trying to get their attention.

By that time I was so rattled that I forgot the number that I was trying to memorize and so I asked them if they would help me. First I asked them to follow that car, and, of course, they didn't know why or anything. Then I told them, 'Well, he had taken me out in the desert and I wanted to call the police.' So they came out of the car then and took me in their house and one of them called the police number and then I talked to the police."

In a matter of a very few minutes, at about 2:30 or 2:45 a. m., a city patrolman by the name of George W. Martin met the prosecutrix, as per appointment, at the corner of Hawthorne and Campbell; she had been accompanied to this corner by Robert Megaw, one of the escorts of the Drake sisters. The officer testified:

"Q. What was the condition of these people that you could see? A. Well, the lady was crying very heavily and I guess the boy was more or less trying to hold her up or something.

"Q. What happened then? A. Well, I asked her what her trouble was and she started telling me, so since it was kind of cold out I told her to get in the back seat of the car so we could talk better and so I told the other fellow to wait outside. Then she proceeded telling me what happened."

Through good detective work the police later that day found defendant's car and this gave them a lead by which they apprehended defendant that evening as he came from work. At a lineup held at the police station shortly thereafter the prosecutrix without hesitation pointed out defendant as the man who had raped her.

In rape cases it has long been recognized by the courts that the victim will usually, at the first opportunity, report the incident. In the early case of Trimble v. Territory, 8 Ariz. 273, 71 P. 932, this court stated:

" * * *. The natural instinct of a female thus outraged and injured prompts her to disclose the occurrence at the earliest opportunity to some relative or friend who has interest in her welfare; and the absence of such a disclosure tends to discredit her as a witness, and may raise an inference against the truth of the charge. To avoid such discredit and inference, it is always competent for the prosecution to show, as a part of its case, that complaint was made recently after the commission of the outrage, and this fact is treated as a circumstance corroborative of the complainant's testimony. * * *"

However, whether the details of the victim's story may be testified to by the party to whom it was told depends upon whether it can properly be considered as a part of what is commonly referred to as the res gestae. Keefe v. State, 50 Ariz. 293, 297, 72 P.2d 425; Wigmore on Evidence, 3rd Ed., sec. 1767; McCormick on Evidence, Topic 5, sec. 274.

At the trial the court—on the theory that it was a part of the res gestae—permitted officer Martin to testify in detail as to what the victim told him when he first met her at the corner of Hawthorne and Campbell. The defendant strenuously objected, contending that this testimony was hearsay hence wholly inadmissible. This adverse ruling is the basis for one of the assignments of error. The facts have already been stated. Was prosecutrix' statement to the officer a "spontaneous utterance"? If it was, the trial court's ruling was correct, otherwise not.

The res gestae rule, its origin, purpose and operation, has been sufficiently ex-

pounded by this court in at least four well-reasoned decisions, viz.: Trimble v. Territory, supra; Soto v. Territory, 12 Ariz. 36, 94 P. 1104; Keefe v. State, supra, and State v. McLain, 74 Ariz. 132, 245 P.2d 278.

We quote an excerpt from an Annotation on Sex Crimes—Res Gestae—Time Element, that succinctly summarizes the rule:

"Res gestae may broadly be defined as matter incidental to the main fact and explanatory thereof and may include acts and words which are so closely connected therewith as to constitute a part of the transaction; and such acts and words must be spontaneous and so related to the occurrence in question as reasonably to appear to be evoked and prompted thereby. Stated differently, the term 'res gestae' comprehends a situation which presents a startling or unusual occurrence sufficient to produce a spontaneous and instinctive reaction, during which interval certain statements are made under such circumstances as to show lack of forethought or deliberate design in the formulation of content. Statements which conform to these requirements and which in some way elucidate, qualify, or characterize the act in question are admissible in evidence as a distinct and separate exception to the hearsay rule. * * *" 19 A.L.R.2d page 582.

■ It is clear from our previous pronouncements that: (1) it is impossible to formulate a definition of *res gestae* which will serve for all cases; (2) no rule may be formulated as to the limit of time within which the exciting cause should be held to have been dissipated so as to render such statement inadmissible; (3) a want of suitable opportunity, or fear, may sometimes excuse or justify a delay in making the disclosure; and (4), each case must depend upon its own facts and *much must be left to the sound discretion of the trial court.*

■ When we apply the well-established legal principles to the case at bar, it appears that the victim's primary concern both at the service station and with the young couples in the parked car near her home was to have them get in touch with the police as quickly as possible. *It was upon the officers of the law that she relied* and, just as soon as the policeman came on the scene, *then,* for the *first time,* she told her story. While the time is not fixed too definitely it would appear that not more than thirty minutes elapsed between the time she got out of defendant's car and the arrival of officer Martin. The condition of the victim at the time of the particular utterance is a very important factor. Here the evidence shows that when the officer arrived the prosecutrix was excited, disheveled, and crying heavily, and her physical condition was such that the escort, Bob

Megaw, was partially holding her up. We believe these facts bring her statement within the realm of a "spontaneous utterance", hence we cannot say that the learned trial court abused its discretion, or erred, in permitting the officer to relate to the jury the victim's statements.

The most serious question raised on this appeal is whether the trial court committed reversible error in admitting the testimony of Miss W——, a seventeen-year-old girl who, over vigorous objection of defense counsel, was permitted to testify that defendant——just five days prior to his alleged rape of the prosecutrix in the instant case—— forcibly raped her in a parked automobile on a lot at the rear of her parents' home in California after luring her there on a pretext of showing her his "new car".

 The general rule is that proof of the commission of another crime cannot ordinarily be put in evidence as proof of the commission of the crime charged, Vigil v. State, 33 Ariz. 51, 262 P. 14; 22 C.J.S. Criminal Law § 688; but one of the well-recognized exceptions to this general rule is where the evidence of the commission of a similar offense tends to show a system, plan or scheme embracing two or more crimes so related to each other that the proof of one tends to establish the other, then such evidence becomes relevant and admissible.

There can be no dispute as to the general rule and its exceptions—the real difficulty comes in applying them to the facts of a particular case. In the reported decisions it must be conceded there is a conflict as to just what facts come within the realm of constituting a scheme, plan or design. The Supreme Court of Minnesota, in the case of State v. De Pauw, 246 Minn. 91, 74 N.W.2d 297, 300, has wisely stated:

"The separate and distinct acts to be admissible must have a reasonably close relation in scheme and pattern and in time to the act charged in order to be admissible under the common plan or scheme exception. The determination, however, of whether independent criminal acts are so closely connected with the crime charged as to be admissible *is in the first instance a matter resting largely within the discretion of the trial court*, and this court will not reverse unless there is a clear abuse of discretion. * * *" (Emphasis supplied.)

By analogy this court recognized the same principle when in the homicide case of State v. Wallace, 83 Ariz. 220, 319 P.2d 529, 531, we said:

"It is also generally recognized that no hard and fast rule of exclusion of evidence may be laid down. A reasonable discretion should be allowed the trial court in determining the relevancy and admissibility of evidence. * * *"

In several cases involving various types of sex crimes we have sustained the admission of evidence of other offenses as coming within this exception. See Taylor v. State, 55 Ariz. 13, 97 P.2d 543; State v. Martinez, 67 Ariz. 389, 198 P.2d 115; State v. McDaniel, 80 Ariz. 381, 298 P.2d 798.

■ Do the facts in the instant case, i. e., the prior rape of another female, bring into play the exception to the rule? For the reasons herein stated we believe that it does. Admittedly the precise problem here presented has not heretofore been passed upon by this court.

We believe the two occurrences were characterized by the manifestation of the same bent of mind and sinister design or practice on the part of the defendant. His design or course of conduct was remarkably similar. Both rapes were committed late at night in parked cars, the victims having either been lured or forced therein by defendant; in both instances the assailant bluntly announced his lustful intentions to have sexual relations with them regardless of their wishes or resistance; this was immediately followed by ripping off their undergarments and proceeding with brute force and violence such as slapping, twisting arms, etc., to accomplish his intentions. In addition to having been raped, both victims complained of severe beatings at the hands of defendant; each one compared his brutal actions with that of a "madman".

Both of them testified that the defendant placed them in peril of their lives if they would not submit to his carnal desires. Probably the most striking similarity in both incidents was the change in personality and facial expression when the victims resisted his advances. Both women testified as to this Dr. Jekyll-Mr. Hyde transformation. They described him as being normal in all outward appearances until they refused to submit—then suddenly his facial expression became frightening and he acted fiendishly or as a "madman".

The rationale underlying the admissibility of evidence of prior acts of rape is partially for the purpose of showing defendant's criminal desires and lustful propensity to commit such a crime. The courts appear to be more liberal in admitting, as proof of his guilt, evidence of similar sex offenses than when one is charged with non-sex offenses.

In support of the conclusion reached we rely in part upon the following authorities: Wigmore on Evidence, Vol. II, 3rd Ed., Sec. 357. Wharton's Criminal Evidence, Vol. I, 12th Ed., Sec. 242. Underhill's Criminal Evidence, 4th Ed., Sec. 187; 5th Ed., Sec. 212. 22 C.J.S. Criminal Law § 688. Annotation 167 A.L.R.—Evidence— other sexual offenses, III 2.(a), page 594. Commonwealth v. Ransom, 169 Pa.Super. 306, 82 A.2d 547; affirmed on appeal, 369 Pa. 153, 85 A.2d 125. (And cases cited

therein.) Commonwealth v. Kline, 361 Pa. 434, 65 A.2d 348. People v. Cosby, 137 Cal. App. 332, 31 P.2d 218.

■ Whenever evidence is admitted of other offenses there is an imperative duty on the trial court to clearly instruct the jury as to the restricted and limited purpose for which such evidence is to be considered. See, People v. Nye, 38 Cal.2d 34, 237 P.2d 1. In the instant case it is manifest that the court fully met this responsibility by giving the following cautionary instruction, viz.:

"Now, in this case, Ladies and Gentlemen of the Jury, there was introduced, as you know, testimony of another alleged crime committed by this defendant. Now, whether or not he is guilty of some crime over in California is no concern of ours in this case here and is no evidence that you can, without anything else, find him guilty in this case, and I permitted that evidence into the case with some reluctance and only permit it now by giving you this cautionary instruction that you can't find him guilty of this crime because you may or may not think him guilty of some other crime. This case has to stand or fall on its own two feet and the State has to prove this case by evidence that satisfies you beyond a reasonable doubt and the other case can't be brought in to prove this case

by itself. But evidence of a crime other than that charged in the information, if you find and believe that such crime was committed by the defendant, is admissible for the sole purpose of showing a system, a plan, a scheme of the defendant and to prove his lustful and lascivious disposition and as having a tendency to render it more probable that the acts and attempted acts of sexual intercourse charged in the information were committed on or about the dates alleged, and it is admitted for no other purpose."

We hold that under the record here presented it was not an abuse of discretion or error for the trial court to admit the testimony of the witness Miss W——.

■ Finally, it is urged that the court improperly allowed evidence on rebuttal as to the reputation of the alleged victim for morality. After the defendant had taken the witness stand and testified that the prosecutrix had consented to sexual intercourse, the State on rebuttal called as character witnesses Reverend William Hobbs, Minister of the First Methodist Church in Tucson, and one Harry Holland. The objection voiced to such evidence was two-fold: (1) the names of the character witnesses had not been endorsed on the information; and (2) that the prosecutrix' reputation had not been put in issue, hence such evidence would be irrelevant, incompe-

tent and immaterial. These objections having been overruled, both men testified that they had known the prosecutrix for some time, and that she bore a good reputation for morality in the neighborhood in which she lived.

Without any specific objection the Minister was permitted to further testify that he had known the lady for four years; that she had been active in youth work and was a member of his congregation; and that for the past year she had been in his employ as "secretary of record", handling upwards of $100,000 of money each year.

The character of a prosecutrix in a rape case takes on a peculiar importance when a defense of consent is asserted, for then the character of the victim for chastity becomes a matter of probative value. I Wigmore, 3rd Ed., Section 62, page 465, note 1.

The Court of Criminal Appeals of Texas, in the case of Coleman v. State, 147 Tex.Cr.R. 198, 179 S.W.2d 552, 553, was faced with this problem. In deciding that such evidence was admissible, the court stated:

: "From Branch's Criminal Law, § 876, p. 559, we quote: 'In a rape case, if the defendant by his testimony assaults the reputation and virtue of the female, the State may sustain her testimony by proof of her general reputation for virtue and chastity.' * * *

The evidence of appellant that the prosecutrix invited or condoned his advances, detailed by him, was sufficient as an assault on her character to form a basis for the rebuttal testimony offered by the State as to her general reputation for chastity. * * *."

We hold there is no merit to this assignment.

It appearing that the defendant was accorded a fair and impartial trial, the judgment of conviction is affirmed.

PHELPS, C. J., and JOHNSON, J., concur.

STRUCKMEYER, Justice (dissenting).

I am unable to concur in the disposition of this criminal appeal.

By the admission into evidence of other crimes, the accused was deprived of the benefit of those rules which are everywhere recognized as necessary to protect against unfair prejudice. His character may not be attacked unless he puts it in issue, nor may prior criminal conduct be shown except by the record of a former conviction. State v. Harris, 73 Ariz. 138, 238 P.2d 957; State v. Polan, 78 Ariz. 253, 278 P.2d 432. Moreover, every experienced lawyer knows that a conviction is a near certainty if the jury but conclude that the accused is a bad man. State v. Lapage, 57 N.H. 245, 24 Am.Rep. 69.

This court was once committed to the proposition that in the prosecution of forceful rape the showing of other crimes of a similar nature against other persons was "wholly beside the issue". Walker v. State, 23 Ariz. 59, 201 P. 398. Ordinarily, no relevant inference can be drawn from the proof of one crime to logically establish proof of another. Dorsey v. State, 25 Ariz. 139, 213 P. 1011. Certain exceptions to the rule against the showing of other criminal offenses have been recognized. In Taylor v. State, 55 Ariz. 13, 97 P.2d 543, reversed on other grounds, 55 Ariz. 29, 97 P.2d 927, the Walker case was overruled and evidence of similar crimes against other persons was permitted in order to show a scheme or plan to commit the crime involved.

It is quite generally considered that if evidence of another offense has relevancy to prove an issue, it is admissible. Nester v. State, Nev., 334 P.2d 524. Evidence of another offense is admissible when it tends to establish motive, intent, the absence of mistake or accident, and identity. Here, no contention is made that any of these are an issue, for the act of intercourse was admitted, the only remaining question being whether force was used. As stated, the rule that permits the showing of similar offenses is based on their relevancy to establish an issue pertinent to the offense charged. In this case, proof that the accused planned to commit forcible rapes is evidentiary of the fact that a forcible act of intercourse took place.

"The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done. A plan is not always carried out, but it is more or less likely to be carried out. * * *" 1 Wigmore, Evidence § 102 (3d ed).

The existence of such a plan or scheme is seldom subject to direct proof. It must be inferred from circumstantial evidence, usually prior conduct. For that reason, testimony may be received concerning the commission of crimes other than the one charged, related in character, time and place, but only so related as to support the conclusion that there was in fact a plan which embraced both the related crimes and the offense for which the accused is on trial. 20 Am.Jur. Evidence, § 314.

It is important to stress that if evidence of another offense is relevant it must reasonably tend to show the plan or scheme, for there is here a double inference: first, from the conduct to the plan; then, from the plan to the consummation by an act. Wigmore, The Science of Judicial Proof § 61, 3d ed.). Since the offense with which the accused is charged is forcible rape, the proof must be such as necessarily tends to establish a plan or scheme to commit forcible rapes. If the proof fails to establish such a plan or scheme, no logical conclusion can be drawn which would sup-

338

port the prosecutrix that force was used, or negative the accused's testimony that the act was voluntary.

The majority of this court has predicated its decision of affirmance on certain features common to the offense for which the accused was on trial and the purported offense occurring five days before. I am not convinced that the asserted common features establish a plan or scheme to commit forcible rapes, for the test is not alone that the two offenses have elements common to both, but whether thereby is established a plan from which flowed the offense with which the accused is charged.

"To bring evidence of other offenses within this rule, the test is not whether they have certain elements in common with the crime charged, but whether they tend to establish a preconceived plan which resulted in the commission of that crime." Lovely v. United States, 4 Cir., 169 F.2d 386, 391.

The fact alone that one woman was raped has no tendency to prove that another woman did not consent. Hence, any similarities in what occurred must not be the usual in crimes of this type, for these can rationally be explained by coincidence. If there is to be any evidentiary value from the proof of similar offenses, they must indeed be similar in those important aspects where normally one would expect to find differences.

Certain of the purported similarities relied on by the majority to affirm this conviction have no probative value in establishing such a plan. Force and threats are elements of the offense without which forcible rape patently cannot be committed, and from which, therefore, the evidentiary fact of a distinctive plan controlling these purported rapes cannot be inferred. In the same category is to be placed the alleged "blunt" announcement by the accused that he intended to have sexual intercourse. Seldom will the offense of forcible rape occur without, at some point prior to the consummation either by words or acts, the announcement of the offender's intention. Likewise, that the incidents happened at night in the accused's automobile are merely facts so common and so coincidental to these crimes as to have no significant probative force. State v. Sauter, 125 Mont. 109, 232 P.2d 731. Similarities such as these are the usual and the ordinary. No scheme or plan can logically be derived from them because they are repeated from one forcible rape to another, irrespective of the persons involved and without planning.

I have a great deal of difficulty in finding any similarity at all in the other points set forth as grounds for affirming this conviction. It is pointed out that the victims were either lured or forced into the defendant's car. Concerning the supposed

related offense occurring in California some 500 miles away, the testimony was:

"\* \* \* A. We went out to the car and I turned the back light on and it lights the whole parking area in the back yard, and when I got to the car I slid in from the drivers side to the passengers side and Rich got in behind me after looking at the car for a while.

"Q. What was your purpose in going out into the yard there? A. Just to look at the car. I like cars."

If it is possible to conclude from this testimony that there was here a luring rather than the grasping of a ready-made opportunity, still there is no similarity to the incident at Tucson, Arizona. A summation of the prosecutrix's testimony on that point follows:

"\* \* \* I was just driving along and stopped for a stop light and he [Finley's companion] pulled up even with me and sort of laughed, or something, and asked if I would go for a drink.

\* \* \* \* \* \*

"Well, I had kept on driving and as I was driving down there why they kept see-sawing in, you know, catching up, then I would get ahead and then they would catch up \* \* \*.

\* \* \* \* \* \*

"Well, they got out of their car and come up to the car I was in and talked to me and asked me again to go out and have a drink with them and I refused."

\* \* \* \* \* \*

"Well, they took my arms and pulled me on into their car door."

The pattern of behavior here is quite different; so different that it tends to rebut rather than support an inference of a common plan controlling the two acts.

It is asserted that after having announced his lustful intention this was immediately followed by ripping off their undergarments. I do not so find the testimony, even if it be assumed that this point has some relevancy. The complaining witness testified:

"I said, 'Oh, you are not.' And he said, 'Yes, I am.' And he said, 'Get your pants off.' I said, 'Well, I will not.' And so he made a grab for them and pulled my pants off."

Concerning the incident in California, the following testimony is fairly descriptive of what occurred:

"Q. And then he took your levys off, is that correct? A. Yes.

"Q. Did you have underwear on underneath? A. Yes.

"Q. Did he take that off, too? A. He pulled them down when he pulled the levys down.

"Q. He pulled them down as far as your ankles too? A. Yes."

The greatest stress is laid on the asserted Doctor Jekyll-Mr. Hyde transformation. Concerning the incident on the Arizona desert, the testimony on the part of the complaining witness was:

"Q. Did you look at his face and his demeanor? A. I certainly did.

He just looked different and he acted different. He was a completely changed person."

Concerning the incident in California, the witness testified:

" * * * then I looked up at him and, from the benefit of the light in the back yard, I could see the expression on his face and that frightened me very much.

"Q. What frightened you about his his expression, Leota? A. Well, it was more or less a mad expression like he was, I don't know how to put it,—sort of, oh, insane expression of some sort."

The point to be made regarding this testimony is that we are seeking to discover a plan, not personality quirks which would tend to establish identity. The concept of a plan to commit rapes necessarily embraces the idea of deliberate behavior. Presumably, the inference sought to be achieved is that the accused consciously decided that if the victims failed to consent he would, by facial expressions, terrify them into submission. Without such an inference, even though there is some possible similarity, no conclusion can be drawn of a preconceived plan to commit the asserted offenses.

The foregoing incidents are absolutely all of the purported facts from which it is urged the plan or scheme to commit the crime of rape can be deduced. Taken singly and collectively, it is simply impossible to conclude from them that the offense for which Finley was tried was the outgrowth of a plan or scheme to commit the crimes of forcible rape.

The majority of this court in support of its position cite People v. Cosby, 137 Cal. App. 332, 31 P.2d 218; Commonwealth v. Ransom, 169 Pa.Super. 306, 82 A.2d 547, affirmed 369 Pa. 153, 85 A.2d 125; and Commonwealth v. Kline, 361 Pa. 434, 65 A.2d 348. Of Commonwealth v. Kline, it is sufficient to point out the statement in the later case of Commonwealth v. Boulden, 179 Pa.Super. 328, 346, 116 A.2d 867, that of the six judges now on that appellate court who sat in the Kline case, all of them consider it to be erroneously decided.

In the Ransom case, evidence was introduced of three offenses in which the appellant had assaulted three different women. The defendant offered an alibi, and the evidence was held to be admissible; first, as bearing upon the identity of the accused, and second, as to his design or plan to rape and rob any women that he

happened to meet while alone and unprotected. The facts of how these rapes and robberies occurred are so distinctly different from this case that no conclusions as to the application of the rules are inferable.

The facts in the Cosby case are worthy of mention simply because from what occurred there can readily be inferred a preconceived plan or scheme. The defendant telephoned the prosecuting witness who had placed an advertisement soliciting work in the Oakland Tribune, and requested her to come to his residence for an interview. When she arrived, he proposed sexual intercourse; and when she refused, she was assaulted. The evidence establishes that on two other occasions the defendant had called women to his residence under the same pretext of employment by contacting them through an employment agency. After they arrived, substantially the same procedure was used as in the case of the prosecuting witness. The California court said [137 Cal.App. 332, 31 P.2d 219]:

"It is apparent, considering the evidence * * *, that appellant devised the scheme or plan of luring women to his apartment for the purpose of gratifying his lust; that he falsely represented to the employment agency that he was engaged in business that required the employment of women; that in pursuance of such design or plan he called up women who adver-tised for employment and made appointments with them at his apartment; that his plan or scheme was to lure them to his apartment under promise of providing them lucrative employment; that when he had them there, he indulged in lewd and suggestive language, and when these lewd suggestions did not meet with approval he attacked them and endeavored by force to accomplish his purpose."

Such a factual situation is wholly different from that presented in this case. As such, it is only authority for the general rule and offers no precedent for the present decision.

Opposed to the authorities relied on by the majority is an abundance of precedent which, when examined in the light of this case, holds to the contrary. Only a few of the later cases need to be mentioned, primarily because this entire problem was thoroughly analyzed and considered by John J. Parker, Circuit Judge, 4th Circuit, United States Court of Appeals in Lovely v. United States, supra, 169 F.2d at page 386, 388. In that case, the accused took the prosecuting witness to the Officers' Club in Fort Jackson where he offered her drinks. Later, he drove her to a spot on the Federal Reservation where he announced his intentions to have sexual relations. When she did not consent, he assertedly raped her. The prosecution was allowed to introduce testimony that the accused had tak-

en another woman out in his car and raped her on the Fort Jackson Reservation about fifteen days before. The court's summation of the proper application of the rule under consideration is in this language:

"It is true, of course, that evidence which has a reasonable tendency to establish the crime charged in the indictment is not rendered inadmissible merely because it establishes another crime; and the question which arises with respect to this sort of evidence is whether or not it has such tendency. In ordinary cases, it is perfectly clear that evidence of other crimes committed by the accused has no such tendency and is properly excluded as irrelevant. Evidence of the commission of similar offenses closely related in time and place may, however, be relevant on such matters as identity, guilty knowledge, motive or intent, where these are in issue, or may tend to establish a criminal plan or design *out of which the crime charged has originated;* but it is well settled that such evidence is not admissible where it has no relevance or probative value *except in so far as it may show a tendency or likelihood on the part of the accused to commit the crime.* See articles by Professor Stone, 46 Harvard Law Review 954 and 51 Harvard Law Review 988; Sutherland v. United States, 4 Cir., 92 F.2d 305, 308; Simpkins v. United States, 4 Cir., 78 F.2d 594; Breedin v. United States, 4 Cir., 73 F.2d 778; Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 295, 35 L.Ed. 1077." [Emphasis supplied.]

The similarities in the two offenses in the Lovely case are much greater than the supposed similarities to be found in the instant case. Yet, the conviction was reversed for the reason that mere similarities do not establish a criminal plan or design out of which the crime charged originated.

In the very recent case of Nester v. State, supra, 334 P.2d at page 527, the court, while affirming the conviction on the basis that the evidence was relevant to establish the identity of the defendant stated:

"The criminal attacks against Rachel Cruz and Edna Weldon were not part of the same purpose, scheme or plan, but were two different schemes wholly independent of each other (although the plan or scheme or modus operandi were similar in many respects) and each could have been proven without the evidence of the other."

In Alford v. State, 223 Ark. 330, 334, 266 S.W.2d 804, 806, the court reversed the conviction for forcible rape where an independent act of rape on another woman was shown, making this statement:

"If the accused has committed other crimes, each may be examined separately in a court of law, and punishment may be imposed for those established with the required certainty. In this way alone can we avoid the elements of unfair surprise and undue prejudice that necessarily attend trial by accusation in place of trial upon facts demonstrated beyond a reasonable doubt."

Before passing from this aspect of the appeal, one further comment should be made. The majority, I believe, further confuse the issues in this case by their statement that:

"The rationale underlying the admissibility of evidence of prior acts of rape is partially for the purpose of showing defendant's criminal desires and lustful propensity to commit such a crime. * * *"

It is to be noted that no precedent is cited for this statement and no authority is alluded to, which characterizes forcible rape as a psychosexual aberration akin to fellatio and sodomy. If the evidence of other criminal acts is admissible to show the defendant's criminal desires, then it must necessarily follow that other criminal acts may never be excluded. This is simply another way of saying that if a defendant has criminal propensities or a lustful disposition, his prior criminal acts may be shown.

I am further in disagreement with the majority in its approval of the prosecutrix' statement to the officer as being a spontaneous utterance. The testimony of the officer supplied no missing elements. It was merely used as a vehicle for presenting the story of the prosecutrix to the jury twice, once from her own lips and once from the lips of the interrogating officer. As such, the testimony was cumulative and served no necessary purpose.

This state has recognized that the time element is always important in determining whether a statement or declaration should be admitted in evidence as part of the res gestae, but time alone is not controlling. We said in Pickwick Stages Corporation v. Williams, 36 Ariz. 520, 525, 287 P. 440, 442 that spontaneity is of more importance than that it be made at the identical instant of the occurrence or at the same place. We also said that a suspicion of afterthought would prevent the reception of the statement.

The majority states that "While the time is not fixed too definitely it would appear that not more than thirty minutes elapsed between the time she [the prosecutrix] got out of defendant's car and the arrival of officer Martin." It appears to me that there was considerably more time involved than that suggested by this statement. The prosecuting witness testified that after the defendant finally agreed to take her home,

he was having car trouble and stopped at three different stations for water. Two of these stations were closed, but at the last one there was an attendant. She did not contact the attendant, but as she said,

"* * * I kept watching him, but every time that he was,—he was closer to Finley all the time and I thought, well, maybe if I go in the rest room I could leave a note in the rest room * * *. There was no rest room for ladies in there and so I just didn't know what to do. I just thought, well, if I just get home, and he was taking me home, and I thought once I get home I can call the police and I felt like the police would take care of the situation then."

It is inconceivable to me that it is possible to say that the prosecutrix' mind ceased functioning during this interval of time. To the contrary, her own testimony points out that even during the course of the ride home she was thinking about calling the police—what she would do. It affirmatively disclosed that the prosecutrix not only had the opportunity to, but did reflect, not only about the incident but about what she would do in the future regarding the occurrence. Under such circumstances, I cannot believe that her statements contained the necessary element of spontaneity. The witness was plainly talking about the facts and not the facts talking through the witness.

I am also opposed to the statement by the majority of this court to the effect that whether a given statement falls within the res gestae is a determination which *must be left* to the sound discretion of the trial court. It is of course true that initially whether a given statement falls within the res gestae is to be determined by the trial court; but in making this determination, some factor must be found which will establish the probability of truthfulness. In this the trial court obviously has no discretion. Where the badges of authenticity are not present, a deferral by this court to the trial court's discretion involves abdication of the appellate function and bestows unlimited power upon the trial court to admit any and all statements under the magic of the res gestae label. It is my belief that this court should insist that the record demonstrate the factors necessarily present for the admission of the evidence, else the exception devour the entire hearsay rule.

The conviction should be reversed.

BERNSTEIN, J., concurs in this dissent.