484 P.2d 1045

STATE of Arizona, Appellee,

v.

Jesus Sanchez LOPEZ, Appellant.

No. 2073.

Supreme Court of Arizona,
In Banc.

May 13, 1971.

Rehearing Denied June 8, 1971.

Gary K. Nelson, Atty. Gen., Carl Waag, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender, James H. Kemper, Deputy Public Defender, Phoenix, for appellant.

LOCKWOOD, Justice:

A jury found the defendant Jesus Sanchez Lopez guilty of murder in the first degree and fixed the penalty at life imprisonment. The court in accordance with the verdict, on June 2, 1969 sentenced defendant to life in the Arizona State Prison. From his conviction, sentence and denial of a motion for new trial defendant appeals citing error by the trial court in the admission of hearsay and other improper testimony which he states deprived him of a fair trial.

After a preliminary hearing an information charging the defendant with the murder of one Oscar Rivera on November 5, 1968 was filed in the Superior Court. Defendant claimed self-defense. At the trial the state did not seek the death penalty. The medical examiner testified that the

cause of death was multiple gunshot wounds. Shortly after the shooting defendant was arrested and stated that he "shot the victim because he didn't feed his children." During the trial defendant testified that the shooting was justified as being in self-defense. He maintains the court erred in permitting the police officer who arrived upon the scene to give a narrative version of the crime as related to the officer by the victim's wife. She was in the courtroom and had already been on the witness stand.

Isabelle Rivera, the widow of the deceased testified at the trial. Her testimony was in substance as follows: She and her six children were living on welfare, as she had not seen her husband Oscar Rivera for approximately three months before the homicide occurred. During this time Isabelle met the defendant and within a short time they became intimate and he spent a considerable portion of his time in the Rivera home. On the afternoon of November 4, 1968 the deceased Oscar Rivera returned and found the defendant in the house watching television. Oscar told his wife to tell the defendant to leave which she did. As the defendant left the house, Isabelle heard him tell the children that he was going to harm Oscar.

Oscar and his wife left the house and went to a nearby house where they spent the night, returning early in the morning. After they had breakfast and had sent the children to school, Isabelle saw the defendant standing in the door of a little house located on the rear of her premises. He spoke to Isabelle and she told him to go away. She went back into the house where her husband Oscar was. She started to iron and Oscar told her he was going to take a bath. Almost immediately afterward she heard a noise and ran to see what it was because she heard someone say "no, no." Oscar came through the kitchen followed by the defendant who had a pistol in his hand. Oscar was not armed. In that order the two men went across the kitchen, the living room and into the bedroom, followed by Isabelle.

The climax came rapidly. The two men were jostling, and the defendant shot Oscar, who at that moment had his hands down at his side. Oscar fell, Isabelle grabbed the defendant, who "wanted to shoot at me." As Oscar fell, he grabbed the defendant, the defendant looked at both Oscar and Isabelle and then threw Isabelle to the side and left.

Isabelle's testimony was that the event happened "about 8 o'clock" in the morning and that the police arrived approximately ten to fifteen minutes thereafter and that she talked with them. At this point in the trial the court recessed for the day. The next morning Isabelle was not present when court convened. The state then called Officer Allen who had arrived at the scene of the homicide about 9:29 on the morning of November 5th. The following testimony to which the defendant objects on the ground that it was hearsay and narrative of a past event, was given by Officer Allen:

"Then I came back and talked to the victim's wife again and asked her what had happened. And she said that her husband was taking a shower that morning, and she was going to get ready and iron a shirt for him. She was setting up the ironing board, and about that time she said she looked towards the kitchen and heard her husband hollering and saw him running towards her. And when she moved into the doorway, he ran past her, and she then noticed the suspect, Mr. Sanchez, following the victim. And she didn't know what to do. She said she sat—she stood and watched as the victim chased—I mean, I am sorry, the suspect chased the victim into the room. And she said she could see the suspect pull a gun and shoot at her husband.

"At that time she said she heard her husband holler out, 'please, just leave me alone.'

"And the suspect then shot the victim, and she started hollering, and she ran and jumped on the suspect. At that time the suspect knocked her to the floor

and shot the victim again—or shot at him.

"And then he turned around and pointed the gun at Isabelle Rivera and attempted to shoot her. And she said, she told me at the time she wasn't sure whether the gun misfired or whether he had no bullets anymore, but she was sure the gun didn't work.

"And at this point; the suspect then ran out the living room through the kitchen door and jumped on his bicycle and pedaled away.

"Q. Did she tell you whether or not the suspect had the gun when Oscar was traveling towards the bedroom?

\*     \*     \*     \*     \*     \*

"According to my report she mentioned to me she had seen the suspect carrying the gun while she was—while he was chasing the victim."

Officer Allen testified that when he arrived "the victim's wife" (Isabelle) "was very hysterical state of mind and was crying and hollering and that is it." As he ran in through the drive into the kitchen door he met Isabelle, and she started to tell him her husband had just been shot. The officer caused Isabelle to lie down on the bed and advised her to stay there until he could investigate. After observing the deceased Oscar and looking over the bedroom, the officer returned and the conversation with Isabelle regarding the homicide occurred.

The defendant concedes that Isabelle was hysterical when she spoke to Officer Allen; that an exciting event had taken place, and only a short time had elapsed between that (the shooting) and the time she told Officer Allen about it. However defendant urges that the exception to the hearsay rule was never intended to allow admission of a long and detailed narrative. At the trial defense counsel objected to Officer Allen's testimony as hearsay.

The state contends on the contrary that Officer Allen's testimony falls within the exception to the hearsay rule which permits what would otherwise be hearsay as a part of the res gestae. Keefe v. State of Arizona, 50 Ariz. 293, 72 P.2d 425 discusses the exception commonly called res gestae and distinguishes the two classes of statements or explanations made in regard to an act in question by witnesses thereof. Keefe refers to "spontaneous exclamations" and "verbal acts":

"A spontaneous exclamation may be defined as a statement or exclamation made immediately after some exciting occasion by a participant or spectator and asserting the circumstances of that occasion as it is observed by him. The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him. Wigmore on Ev. (2d Ed.) par. 1747."

Keefe points out the confusion between the exception which is defined as a "spontaneous exclamation" and that which is designated as a "verbal act". In effect the latter is an utterance which accompanies some act or conduct to which it is desired to give a legal effect. The use of utterances as verbal acts, as described in Keefe has four limitations:

"(a) the conduct to be characterized by these words must be material to the issue; (b) it must be equivocal in its nature; (c) the words must aid in giving legal significance to the conduct; and (d) the words must accompany the conduct." 50 Ariz. at 298, 72 P.2d at 427.

Keefe further points out the different requirements between "verbal acts" and "spontaneous exclamations".

"The true test in spontaneous exclamations is not when the exclamation was made, but whether under all the circumstances of the particular exclamation the speaker may be considered as speaking under the stress of nervous excitement and shock produced by the act in issue, or whether that nervous excitement has died away so that the remark is elicited by the shock of some other act not at issue, which revives the memory of the act in question." 50 Ariz. at 298, 299, 72 P.2d at 427.

See also State v. Randolph, 99 Ariz. 253, 408 P.2d 397; State v. Boodry, 96 Ariz. 259, 394 P.2d 196; State v. McLain, 74 Ariz. 132, 245 P.2d 278. We believe under the circumstances here, the trial court did not abuse its discretion in admitting such testimony as a part of the res gestae and therefore an exception to the hearsay rule.

The state in rebuttal introduced the testimony of Frances, the daughter of the deceased. She testified regarding the defendant's statement on the night he was told to leave, that he would hurt the victim, her father. She also testified that defendant returned to the Rivera home a short time after he left on November 4th and that her mother and father were not home. Defense objected to this line of questioning, and the court then limited the testimony to rebuttal of self-defense. The prosecution did not pursue the matter further. Defendant in his appeal maintains that this was new matter, not meant to impeach anything said by the defendant and therefore improper rebuttal. We cannot agree.

Defendant testified that he was ordered out of the Rivera home two weeks before the shooting, not the evening before. He also said his reason for visiting the home on the *morning* of the shooting was to retrieve some items of clothing left in his hasty departure and that the shooting was in self-defense. Frances' testimony helped to establish the facts and that defendant had an opportunity to obtain his clothing the evening before the shooting, and tends to negative self-defense.

Defendant's final contention is that the court committed prejudicial error by permitting the prosecutor to cross-examine in respect to his illegal entry into the country and deportation on a previous occasion. On direct examination defendant testified that he was a Mexican National and that he had never been arrested or gotten in any trouble. During cross-examination the prosecution questioned defendant regarding the development of his relationship with Isabelle and his presence in the area and defendant in response revealed that he was unable to get work in Mexico and therefore twice illegally entered the country and was arrested and deported after the first entry. Under these circumstances, the defendant had opened the door to impeachment of his credibility when he denied he had ever been arrested. See LaGrange v. State, 26 Ariz. 102, 222 P. 414 and Garrett v. State, 25 Ariz. 508, 219 P. 593.

We believe the trial court did not abuse its discretion by admitting such evidence.

Judgment and sentence affirmed.

HAYS, V. C. J., and UDALL and CAMERON, JJ., concur.

STRUCKMEYER, Chief Justice (dissenting).

For the third time I am compelled to dissent to the admission of hearsay testimony of the class and character approved by the majority of the Court. In my dissent in State v. Finley, 85 Ariz. 327–343, 338 P.2d 790–801, I said:

"The testimony of the officer supplied no missing elements. It was merely used as a vehicle for presenting the story of the prosecutrix to the jury twice, once from her own lips and once from the lips of the interrogating officer."

Under the circumstances of this case, the testimony of the officer was at best cumulative and wholly unnecessary, since the prosecutrix was present in court, able to, and did, testify.

The testimony from the lips of the investigating officer was erroneous and prejudicial, first because there was ample opportunity between the time of the shooting and the relating of the prosecutrix's story for her to reflect on and polish any rough spots. Her story to the police lacks the necessary guarantee of truthfulness, spontaneity. Second, it is doubly prejudicial because the story related to the jury by the police officer thereby takes on the credibility of the majesty of the law. It cannot be tested for truthfulness because the facts related are not subject to cross-examination. To say that the testimony is spontaneous after the intervening time is pure, unadulterated nonsense. *See also* the dissent in State v. Owen, 94 Ariz. 404, 385 P.2d 700.