534 P.2d 449

**The STATE of Arizona, Appellee,**

v.

**Antonio Escarsega VALDEZ, Appellant.**

**No. 2 CA–CR 446.**

Court of Appeals of Arizona,
Division 2.

April 24, 1975.

Rehearing Denied May 27, 1975.

Review Denied Sept. 18, 1975.

N. Warner Lee, Former Atty. Gen., Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, and Galen H. Wilkes, Asst. Attys. Gen., Phoenix, for appellee.

Donau, Bolt, Hickle & Whitley by Alfred S. Donau, III, Tucson, for appellant.

## OPINION

HOWARD, Chief Judge.

Appellant was charged with and convicted by a jury of one count of rape and two counts of lewd and lascivious acts with a prior conviction of rape and lewd and lascivious acts. He was sentenced to a term of not less than 20 nor more than 25 years in the Arizona State Prison on the rape conviction and to a term of not less than one nor more than five years on each count of lewd and lascivious acts to run concurrently with each other and consecutively to the sentence on the rape conviction.

Appellant contends the trial court erred by admitting into evidence testimony concerning the prior conviction for rape and lewd and lascivious acts, in instructing the jury, and by permitting the state's complaining witness to testify that appellant told her he had been "sniffing coke".

The evidence considered in the light most favorable to upholding the jury ver-

dict shows that the rape victim, Carmen Martinez, had prior to April 11, 1974, seen appellant several times at a friend's house. Carmen had recently bought two small houses. She lived in the front house which consisted of a front room, a kitchen, a hallway and bathroom. The sleeping quarters were in the front room. The back house was in need of repairs and was vacant. On April 11, 1974, appellant and two other persons were sent to Carmen's house by Larry, a mutual friend, to put tile in her back house. After finishing laying the tile, the three left.

Around 12:30 a. m. on April 12th, Carmen had just turned out the lights to retire when there was a knock at the door. She went to the window and saw appellant standing there. She asked him what he wanted, and he asked her if she had seen either Larry or Mando. Carmen told him she had not seen them, and appellant then told her that he had been drinking with them and somehow they had gotten separated. He asked if Carmen knew where they might be. She told him to try either Larry's or Mando's house, and appellant said he had already gone there. Appellant asked Carmen if she knew where else he might find them, and she replied that she did not know. Then appellant told her that he couldn't hear her, and Carmen opened the door. Appellant began telling Carmen he was really drunk and didn't know if he would be able to make it back to where he lived, that he didn't have anywhere to stay and he wanted to know if he could sleep in the back house. She told him it was very cold, that she didn't think he should sleep in the back house and that he ought to go back to Larry's house. Appellant asked for a blanket, and Carmen went to the back house and opened it for him. Appellant then told her the blanket was too good and was going to get messy.

With appellant following her, Carmen went into the house, gave him a bedspread and then went to the back door to open it for appellant when he grabbed her around the mouth and told her not to make any noise. Carmen struggled with him but did not scream for fear of awakening her little boy who was asleep in the front room. He finally took her into the front room and after her clothes had been partially removed by her and by appellant, attempted to have intercourse with her but at first was not able to do so. The sexual assault lasted about two and one-half hours during which time appellant did succeed in having sexual intercourse with her more than one time, rubbed his penis on her buttocks, and at one time took her into the bathroom and splashed water on the vagina because he said she was "too dry". It was a little before 3:00 a. m. when appellant finally left.

Another witness for the state testified that on July 30, 1972, she lived across the street from appellant and was then acquainted with him. She testified that about 2:00 o'clock in the morning on July 30th, she had been sleeping when appellant knocked at her door stating he was looking for his brother. She told him his brother wasn't there but he insisted that his brother had to be there because he couldn't find him. He told her he wanted to look in the house to see if his brother was there, and she finally let him into the house in order to show him his brother was not there. She was standing by the front door, thinking he was going to leave, when appellant grabbed her from behind. She struggled with him and ran out the front door, but he ran after her, covered up her face so she could not breathe and carried her back into the house. Over a period of about an hour appellant had sexual intercourse with her several times. While he was dozing off, she escaped and ran to a neighbor's house. The police were called and appellant was arrested and subsequently convicted of rape and lewd and lascivious acts.

In State v. McFarlin, 110 Ariz. 225, 517 P.2d 87 (1973), our Supreme Court recognized the confusion in the Arizona cases as to the admissibility of prior bad acts in cases involving sex offenses. It held that the "lustful disposition" or "emotional propensity" exception is limited

to cases involving sexual aberration stating, "As one court pointed out, the fact that one woman was raped is not substantial evidence that another did not consent. Lovely v. United States, 169 F.2d 386 (1948)." 110 Ariz. at 228, 517 P.2d at 90. See, State v. Williams, 505 P.2d 1092 (Ariz., 1975).

■ However, the Court clearly indicated that other exceptions to the exclusionary rule can still be used. If the prior bad act shows a common plan, scheme, or device and is not too remote in time, such prior bad act is admissible. State v. McFarlin, supra. Mere similarity between the crime charged and the prior bad act is not sufficient. The acts must have common features indicating a common design or plan. 2 Wigmore on Evidence § 304 (1940). The following cases demonstrate the common plan or scheme exception in rape cases. In Dean v. State, 277 So.2d 13 (Fla.1973), in each incident the defendant got the victim into his car by trick, made sexual advances and when rejected "pulled a gun". In Coney v. State, 193 So.2d 57 (Fla.App.1966), the defendant accomplished the rapes by initially blocking the victims' car with his own car. In State v. Smith, 259 La. 515, 250 So.2d 724 (1971), the victims were accosted on the street, the defendant put a knife to their throats and covered their eyes with a scarf. In People v. Holliman, 274 Cal.App.2d 89, 78 Cal. Rptr. 826 (1969), each rape took place in an apartment house, entry to which was gained through the laundry room, and in each instance the defendant was armed with a black gun. Attention is also directed to our own case of State v. Finley, 85 Ariz. 327, 338 P.2d 790 (1959) where the court held a prior rape admissible under the common scheme or plan exception under circumstances which can only be considered tenuous in comparison to the facts of this case.

Finally, on the issue of remoteness, in State v. Morgan, 207 Kan. 581, 485 P.2d 1371 (1971), one of the prior rapes took place two years before the rape for which the defendant was charged. In Power v. State, 43 Ariz. 329, 30 P.2d 1059 (1934) the court held that the trial judge did not err in admitting acts which occurred two years prior to the one charged.

■ In the case at bench we find that there are more than gross similarities between the acts charged and the prior rape. In both cases appellant was casually acquainted with the victim. His opening gambit was the same, to wit, the pretense of looking for someone. Both rapes took place in the early morning hours and both involved a sexual tour-de-force including a request for oral copulation. These similarities show a common design, plan, scheme and modus operandi and therefore the trial court did not err in allowing evidence of the prior rape.

Appellant claims the court erred in giving state's Instruction No. 10 which was taken from California Jury Instructions, Criminal, 3rd Ed. § 2.50. Appellant did not object to the instruction on the ground he now raises on appeal and has therefore waived any error.

■ During the course of the complaining witness' direct testimony she stated that appellant told her, while he was attempting to have intercourse, that he had been "sniffing coke". Appellant contends that the trial court erred in refusing to strike this testimony and declare a mistrial. It is obvious that the term "sniffing coke" means the sniffing of cocaine. Appellant's reference to "sniffing coke" was intended as an explanation of why he could not get an erection. There are a legion of cases supporting the proposition that statements and conduct of the accused at the time of the commission of offense are part of the transaction itself and may be admissible as res gestae although they may have a tendency to inflame the jury. 22A C.J.S. Criminal Law § 669 (1961). We therefore hold that the court did not err in allowing the testimony.

■ Even though the appellant is represented by counsel on appeal, it is incumbent upon this court to search the record

for fundamental error. A.R.S. § 13–1715(B). We believe it is fundamental error to convict a person for a crime when there is absolutely no evidence to support such conviction. Appellant was convicted of two counts of lewd and lascivious acts which consisted of rubbing his penis on the victim's buttocks and splashing water on her vagina. A.R.S. § 13–652 provides in part:

> "A person who wilfully commits, *in any unnatural manner,* any lewd or lascivious act upon or with the body or any part or member thereof of a male or female person, with the intent of arousing, appealing to or gratifying the lust, passion or sexual desires of either of such persons, is ·guilty of a felony punishable by imprisonment for not less than one nor more than five years."

■■■ Under this statute there is the requirement not only that the act be lewd and lascivious but also that it be done in an "unnatural manner". In State v. Mortimer, 105 Ariz. 472, 467 P.2d 60 (1970), a case involving homosexual activity, the court, in construing the words "in an unnatural manner", held that "sexuality for purposes other than having children" is " 'unnatural' or sinful." 105 Ariz. at 473, 467 P.2d at 61. Although the constitutionality of the statute was not at issue, the court in *Mortimer* observed that the statute's constitutionality had previously been upheld in Lovelace v. Clark, 83 Ariz. 27, 315 P.2d 876 (1957). The efficacy of the *Lovelace* case has been seriously impaired by the holding of the Ninth Circuit in Jellum v. Cupp, 475 F.2d 829 (9th Cir. 1973). In *Jellum* the Oregon Supreme Court, recognizing the vagueness of the term "act of sexual perversity", had narrowed the meaning of the statute by requiring (1) the direct involvement of a sex organ and (2) unnatural conduct contrary to the course of nature which (3) is performed for the purpose of accomplishing abnormal sexual satisfaction on the part of the actor. The Ninth Circuit ·Court of Appeals, in striking down the Oregon statute as narrowed by the interpretation of its

Supreme Court, noted that the phrase "unnatural conduct contrary to the course of nature" had no definite meaning in common law. Similarly, it observed that the term "abnormal sexual satisfaction" had no common law background. The Court then stated:

> "There is simply no commonly accepted, definite meaning of the phrase 'unnatural conduct contrary to the course of nature.' Accordingly, we must conclude that the statute, as construed in *Anthony,* [State v. Anthony, 179 Or. 282, 169 P.2d 587] supplies a jury (or a judge sitting without a jury) no legally fixed standards under which to determine guilt. Further, we note that the statute does not supply any standard or basis for a trial judge to apply in submitting one case to a jury or refusing to submit another for jury consideration. This same looseness in the statutory language would allow a state prosecutor to use the statute selectively to rid the community of persons subjectively deemed guilty of committing 'abnormal' or 'unnatural' acts." 475 F.2d at 832.

The Ninth Circuit quoted with approval the opinion of the trial judge:

> " 'The varieties of human sexual behavior are encyclopedic. A beginning inventory, from arson to zooerastry, can be found in R. von Krafft-Ebing, *Psychpathia Sexualis.* If a statute allows the district attorney to pick through this catalog and make a felony of any sex-related act that offends his concept of "normal" behavior, the statute is, of course unconstitutional.' " 475 F.2d at 832.

We need not, however, reach the constitutionality issue in this case since we are convinced that the acts committed by appellant were not "unnatural" as that term is used in A.R.S. § 13–652 and as interpreted by our court in State v. Mortimer, supra.

The dissent claims that the testimony indicates that appellant *desired* to effectuate sodomy. This theory was never advanced by the state in the trial court. The testi-

mony cited by the dissent could also refer to position. At most the testimony is ambiguous and the state did not therefore sustain its burden of proof beyond a reasonable doubt. Furthermore, the statute proscribes lewd and lascivious *acts* committed in an unnatural manner, not lewd and lascivious *thoughts*.

Accordingly, we affirm appellant's conviction and sentence for rape. The two convictions of lewd and lascivious acts, are reversed and Counts Two and Three are dismissed.

KRUCKER, J., concurs.

HATHAWAY, Judge (concurring in part and dissenting in part).

Appellant's midnight incursion into his victim's one-room, efficiency-type home, where she was alone with her four-year-old son, and the ensuing two-and-one-half-hour ordeal of assault and sexual attack, including rubbing his penis on his victim's buttocks—desiring entry "from the rear" [1] —in my opinion, supports one count of the conviction of unnatural lewd and lascivious acts. The majority maintains that the prosecution did not elaborate on the attempted sodomy at trial. It seems apparent that the phraseology used by the victim at trial, as well as her intonation and expressions which we cannot appreciate on appeal, must have been so expressive as to preclude the necessity for elaboration and left no doubt in the jury's mind that sodomy was contemplated. This view is further borne out by appellant's declining to even challenge the sufficiency of the evidence.

Appellant's forced advances aimed at sodomy, A.R.S. § 13–651 (as amended 1965), conducted in the same room occupied by the victim's four-year-old son, and despite her pleas, crying and resistance, could only be considered "natural" conduct in a barbaric, savage society. I am compelled, however, to the conclusion that all reasonable people must agree such dehumanizing, gross indecency is unnatural.

The constitutionality of the statute has been adequately tested for purposes of this appeal in State v. Mortimer, 105 Ariz. 472, 467 P.2d 60 (1970).

I concur in the affirmance of the rape count, but I would also affirm as to the one count of a lewd and lascivious act which centers on the activity described in this dissent and reverse as to the second count involving the splashing of water on the victim's sexual parts.

1. "Q. Carmen, I think you were saying that you were on the floor, and the defendant was taking your panties off? Is that correct?

Q. And after he did that, did you say he was rolling you over?

A. Yes. He got on top of me; he tried to penetrate me; then—he couldn't get an erection. He said it was because he had been drinking. He rolled me over onto my stomach; he said something about—he kept rubbing himself—

Q. What do you mean, 'himself?'

A. Rubbing his penis on my—on my buttocks. He said something to me then about—about wanting to enter me from the rear. I told him, 'No,' to please not to do that. He couldn't get an erection; he wanted me to have oral sex with him. I said, 'No,' that I couldn't do that—"